Keating, J. (dissenting).
Certainly, the record in this case, sound legal analysis, relevant policy considerations and even precedent cannot account for or sustain the result which the majority have here reached. For the result is premised upon a legal rule which long ago should have been abandoned, having lost any justification it might once have had. Despite almost universal condemnation by legal scholars, the rule survives, finding its continuing strength, not in its power to persuade, but in its ability to arouse unwarranted judicial fears of the consequences of overturning it.
Linda Biss, an attractive young woman, was for more than six months terrorized by a rejected suitor well known to the courts of this State, one Burton Pugach. This miscreant, masquerading as a respectable attorney, repeatedly threatened to have Linda killed or maimed if she did not yield to him: “ If I can’t have you, no one else will have you, and when I get through with you, no one else will want you ”. In fear for her life, she went to those charged by law with the duty of preserving and safeguarding the lives of the citizens and residents of this State. Linda’s repeated and almost pathetic pleas for aid were received with little more than indifference. Whatever help she was given was not commensurate with the identifiable danger. On June 14, 1959 Linda became engaged to another man. At a party held to *584 celebrate the event, she received a phone call warning her that it was her “last chance”. Completely distraught, she called the police, begging for help, but was refused. The next day Pugach carried out his dire threats in the very manner he had foretold by having a hired thug throw lye in Linda’s face. Linda was blinded in one eye, lost a good portion of her vision in the other, and her face was permanently scarred. After the assault the authorities concluded that there was some basis for Linda’s fears, and for the next three and one-half years, she was given around-the-clock protection.
No one questions the proposition that the first duty of government is to assure its citizens the opportunity to live in personal security. And no one who reads the record of Linda’s ordeal can reach a conclusion other than that the City of New York, acting through its agents, completely and negligently failed to fulfill this obligation to Linda.
Linda has turned to the courts of this State for redress, asking that the city be held liable in damages for its negligent failure to protect her from harm. With compelling logic, she can point out that, if a stranger, who had absolutely no obligation to aid her, had offered her assistance, and thereafter Burton Pugach was able to injure her as a result of the negligence of the volunteer, the courts would certainly require him to pay damages. (Restatement, 2d, Torts, § 323.) Why then should the city, whose duties are imposed by law and include the prevention of crime (New York City Charter, § 435) and, consequently, extend far beyond that of the Good Samaritan, not be responsible? If a private detective acts carelessly, no one would deny that a jury could find such conduct unacceptable. Why then is the city not required to live up to at least the same minimal standards of professional competence which would be demanded of a private detective ?
Linda’s, reasoning seems so eminently sensible that surely it must come as a shock to her and to every citizen to hear the city argue and to learn that this court decides that the city has no duty to provide police protection to any given individual. What makes the city’s position particularly difficult to understand is that, in conformity to the dictates of the law, Linda did not carry any weapon for self-defense (former Penal Law, § 1897). Thus, by a rather bitter irony she was required to rely for protection *585 on the City of New York which now denies all responsibility to her.
It is not a distortion to summarize the essence of the city’s case here in the following language: “ Because we owe a duty to everybody, we owe it to nobody.” Were it not for the fact that this position has been hallowed by much ancient and revered precedent, we would surely dismiss it as preposterous. To say that there is no duty is, of course, to start with the conclusion. The question is whether or not there should be liability for the negligent failure to provide adequate police protection.
The foremost justification repeatedly urged for the existing rule is the claim that the State and the municipalities will be exposed to limitless liability. The city invokes the specter of a “ crushing burden ” (Steitz v. City of Beacon, 295 N. Y. 51, 55) if we should depart from the existing rule and enunciate even the limited proposition that the State and its municipalities can be held liable for the negligent acts of their police employees in executing whatever police services they do in fact provide (cf. dissenting opn. per Desmond, J., in Steitz v. City of Beacon, supra, p. 57; dissenting opn. per Beldock, J., in Schuster v. City of New York, 286 App. Div. 389, 391).
The fear of financial disaster is a myth. The same argument was made a generation ago in opposition to proposals that the State waive its defense of “sovereign immunity”. The prophecy proved false then, and it would now. The supposed astronomical financial burden does not and would not exist. No municipality has gone bankrupt because it has had to respond in damages when a policeman causes injury through carelessly driving a police car or in the thousands of other situations where, by judicial fiat or legislative enactment, the State and its subdivisions have been held liable for the tortious conduct of their employees. Thus, in the past four or five years, New York City has been presented with an average of some 10,000 claims each year. The figure would sound ominous except for the fact the city has been paying out less than $8,000,000 on tort claims each year and this amount includes all those sidewalk defect and snow and ice cases about which the courts fret so often. (Reports submitted by the Comptroller of the City of New York to the Comptroller of the State of New York pursuant to General Municipal Law, § 50-f.) Court delay has reduced the figure paid *586 somewhat, but not substantially. Certainly this is a slight burden in a budget of more than six billion dollars (less than two tenths of 1%) and of no importance as compared to the injustice of permitting unredressed wrongs to continue to go unrepaired. That Linda Biss should be asked to bear the loss, which should properly fall on the city if we assume,, as we must, in the present posture of the case, that her injuries resulted from the city’s failure to provide sufficient police to protect Linda is contrary to the most elementary notions of justice.
The statement in the majority opinion that there are no predictable limits to the potential liability for failure to provide adequate police protection as compared to other areas of municipal liability is, of course, untenable. When immunity in other areas of governmental activity was removed, the same lack of predictable limits existed. Yet, disaster did not ensue.
Another variation of the ‘1 crushing burden ’ ’ argument is the contention that, every time a crime is committed, the city will be sued and the claim will be made that it resulted from inadequate police protection. Here, again, is an attempt to arouse the “ anxiety of the courts about new theories of liability which may have a far-reaching effect”. (Spiegler v. City of New Rochelle, 39 Misc 2d 720, 723, affd. on opn. below 19 A D 2d 751, mot. for lv. to app. den. 13 N Y 2d 600.) And here too the underlying assumption of the argument is fallacious because it assumes that a strict liability standard is to be imposed and that the courts would prove completely unable to apply general principles of tort liability in a reasonable fashion in the context of actions arising from the negligent acts of police and fire personnel. The argument is also made as if there were no such legal principles as fault, proximate cause or forseeability, all of which operate to keep liability within reasonable bounds. No one is contending that the police must be at the scene of every potential crime or must provide a personal bodyguard to every person who walks into a police station and claims to have been threatened. They need only act as a reasonable man would under the circumstances. At first there would be a duty to inquire. If the inquiry indicates nothing to substantiate the alleged threat, the matter may be put aside and other matters attended to. If, however, the claims prove to have some basis, appropriate steps would be necessary.
*587 The instant case provides an excellent illustration of the limits which the courts can draw. No one would claim that, under the facts here, the police were negligent when they did not give Linda protection after her first calls or visits to the police station in February of 1959. The preliminary investigation was sufficient. If Linda had been attacked at this point, clearly there would be no liability here. When, however, as time went on and it was established that Linda was a reputable person, that other verifiable attempts to injure her or intimidate her had taken place, that other witnesses were available to support her claim that her life was being threatened, something more was required—either by way of further investigation or protection — than the statement that was made by one detective to Linda that she would have to be hurt before the police could do anything for her.
In dismissing the complaint, the trial court noted that there are many crimes being committed daily and the police force is inadequate to deal with its “ tremendous responsibilities ”. The point is not addressed to the facts of this case. Even if it were, however, a distinction must be made. It may be quite reasonable to say that the City of New York is not required to hire sufficient police to protect every piece of property threatened during mass riots. The possibility of riots may even be foreseeable, but the occurrence is sufficiently uncommon that the city should not be required to bear the cost of having a redundancy of men for normal operations. But it is going beyond the bounds of required judicial moderation if the city is permitted to escape liability in a situation such as the one at bar. If the police force of the City of New York is so understaffed that it is unable to cope with the everyday problem posed by the relatively few cases where single, known individuals threaten the lives of other persons, then indeed we have reached the danger line and the lives of all of us are in peril. If the police department is in such a deplorable state that the city, because of insufficient manpower, is truly unable to protect persons in Linda Biss’ position, then liability not only should, but must be imposed. It will act as an effective inducement for public officials to provide at least a minimally adequate number of police. If local officials are not willing to meet even such a low standard, I see no reason for the courts to abet such irresponsibility.
*588 It is also contended that liability for inadequate police protection will make the courts the arbiters of decisions taken by the Police Commissioner in allocating his manpower and his resources. We are not dealing here with a situation where the injury or loss occurred as a result of a conscious choice of policy made by those exercising high administrative responsibility after a complete and thorough deliberation of various alternatives. There was no major policy decision taken by the Police Commissioner to disregard Linda Riss’ appeal for help because there was absolutely no manpower available to deal with Pugach. This “garden variety” negligence case arose in the course of “ day-by-day operations of government ” (Weiss v. Fote, 7 N Y 2d 579, 585). Linda Riss’ tragedy resulted not from'high policy or inadequate manpower, but plain negligence on the part of persons with whom Linda dealt. (See Lubelfeld v. City of New York, 4 N Y 2d 455; Prosser, Torts [3d ed.], pp. 999-1001; Peck, Federal Tort Claims—Discretionary Function, 31 Wash. L. Rev. 207.)
More significant, however, is the fundamental flaw in the reasoning behind the argument alleging judicial interference. It is a complete oversimplification of the problem of municipal tort liability. What it ignores is the fact that indirectly courts are reviewing administrative practices in almost every tort case against the State or a municipality, including even decisions of the Police Commissioner. Every time a municipal hospital is held liable for malpractice resulting from inadequate record-keeping, the courts are in effect making a determination that the municipality should have hired or assigned more clerical help or more competent help to medical records or should have done something to improve its record-keeping procedures so that the particular injury would not have occurred. Every time a municipality is held liable for a defective sidewalk, it is as if the courts are saying that more money and resources should have been allocated to sidewalk repair, instead of to other public services.
The situation is nowise different in the case of police protection. Whatever effects there may be on police administration will be one of degree, not kind. In McCrink v. City of New York (296 N. Y. 99) we held the city liable where a drunken policeman, while off duty, shot and killed a citizen in an unprovoked assault. The policeman had a long history of being a *589 troublemaker, having been brought up before the Police Commissioner on drunkenness charges on three prior occasions. In imposing liability on the city, were we not in effect overruling the Commissioner’s judgment in retaining the policeman on the force and saying his decision was so unreasonable that the city should be required to pay damages? (See, also, Meistinsky v. City of New York, 309 N. Y. 998.)
The truth of the matter, however, is that the courts are not making policy decisions for public officials. In all these municipal negligence eases, the courts are doing two things. First, they apply the principles of vicarious liability to the operations of government. Courts would not insulate the city from liability for the ordinary negligence of members of the highway department. There is no basis for treating the members of the police department differently.
Second, and most important, to the extent that the injury results from the failure to allocate sufficient funds and resources to meet a minimum standard of public administration, public officials are presented with two alternatives: either improve public administration or accept the cost of compensating injured persons. Thus, if we were to hold the city liable here for the negligence of the police, courts would no more be interfering with the operations of the police department than they “ meddle ” in the affairs of the highway department when they hold the municipality liable for personal injuries resulting from defective sidewalks, or a private employer for the negligence of his employees. In other words, all the courts do in these municipal negligence cases is require officials to weigh the consequences of their decisions. If Linda Biss’ injury resulted from the failure of the city to pay sufficient salaries to attract qualified and sufficient personnel, the full cost of that choice should become acknowledged in the same way as it has in other areas of municipal tort liability. Perhaps officials will find it less costly to choose the alternative of paying damages than changing their existing practices. That may be well and good, but the price for the refusal to provide for an adequate police force should not be borne by Linda Biss and all the other innocent victims of such decisions.
What has existed until now is that the City of New York and other municipalities have been able to engage in a sort of false *590 bookkeeping in which the real costs of inadequate or incompetent police protection have been hidden by charging the expenditures to the individuals who have sustained often catastrophic losses rather than to the community where it belongs, because the latter had the power to prevent the losses.
Although in modern times the compensatory nature of tort law has generally been the one most emphasized, one of its most important functions has been and is its normative aspect. It sets forth standards of conduct which ought to be followed. The penalty for failing to do so is to pay pecuniary damages. At one time the government was completely immunized from this salutary control. This is much less so now, and the imposition of liability has had healthy side effects. In many, areas, it has resulted in the adoption of better and more considered procedures just as workmen’s compensation resulted in improved industrial safety practices. To visit liability upon the city here will no doubt have similar constructive effects. No “ presumed cure ’ ’ for the problem of crime is being ‘ ‘ foisted ’ ’ upon the city as the majority opinion charges. The methods of dealing with the problem of crime are left completely to the city’s discretion. All that the courts can do is make sure that the costs of the city’s and its employees’ mistakes are placed where they properly belong. Thus, every reason used to sustain the rule that there is no duty to offer police protection to any individual turns out on close analysis to be of little substance.
The city properly cites Motyka v. City of Amsterdam (15 N Y 2d 134), Steitz (supra) and other cases in support of its position. But what is of importance here are cases such as Bernardine (infra), Meistinsky (supra), Runkel (infra) and Schuster (infra), for these cases signify the direction in which the law is proceeding. They indicate how, step by step, New York courts are moving to return* — albeit with some notable setbacks — toward the day when the government, in carrying out its various functions, will be held equally responsible for the negligent acts of its employees as would a private employer. Bernardine v. City of New York (294 N. Y. 361), one of the earliest cases, is cited generally for the proposition that the State’s waiver of *591 ‘ ‘ sovereign immunity ’ ’ is applicable to its subdivisions. What is of greater interest about the case is that it premised liability on pure common-law negligence. But although “ sovereign immunity ”, by that name, supposedly died in Bernardine v. City of New York, it has been revived in a new form. It now goes by the name — ‘ ‘ public duty ’
Thus, in Steitz v. City of Beacon (295 N. Y. 51), relying on Moch Co. v. Rensselaer Water Co. (247 N. Y. 160), a pre-waiver case, the old rule was revived under a new guise that the duty to furnish police and fire protection runs to the general public and not to any individual. Yet in Runkel v. Homelsky (286 App. Div. 1101, affd. 3 N Y 2d 857), we held the city liable for failure to order the removal of a vacant building where a city inspector had actual notice that the building was in imminent danger of collapse but did nothing. (See, also, Runkel v. City of New York, 282 App. Div. 173.) Logically, there was nothing left to Seitz after Runkel. Nevertheless, again in Motyka v. City of Amsterdam (15 N Y 2d 134, supra), in a case involving the failure to enforce a fire safety regulation, we again retreated and held that “liability arises out of a statute only in limited instances where disregard of the command of the statute results in damage to one of the class for whose special benefit the statute was enacted.” (Id., p. 139.) (See, also, Messineo v. City of Amsterdam, 17 N Y 2d 523.)
In Infosino v. City of New York (25 A D 2d 841, mot. for lv. to app. den. sub nom. Carroll v. City of New York, 18 N Y 2d 583), liability was again denied, but in that case there was no negligence involved since there was no notice to the city of the violation of the provisions of the Administrative Code. In addition, there was a serious question of proximate cause in the ease. To deny liability on ordinary principles of tort law offers a far better approach to the question of municipal tort liability than the fiction that there is no duty running to the general public.
The majority opinion would explain the result here as involving the protection of the public from an “ external hazard.” This attempt to reconcile the case law does not withstand analysis. Is not a blizzard or snowstorm an “ external hazard ’ ’ Í Analytically, the problems of providing adequate police protection and snow removal are indistinguishable.
*592 Fortunately, this court has avoided the misfeasance-nonfeasance doctrine (Runkel v. Homelsky, supra; McCrink v. City of New York, supra; Schuster v. City of New York, 5 N Y 2d 75, 82) which is still another untenable attempt to limit the consequences of the State’s waiver of liability. As Chief Judge Desmond pointed out so often, the broad language of the waiver of “ sovereign immunity” in the Court of Claims Act (§ 8) should have been sufficient to cover the police and fire protection cases. (See, e.g., Steitz v. City of Beacon, 295 N. Y., supra, pp. 58-59.) Therefore, the majority opinion’s call for legislative action is answered by the fact that it has already occurred. The statute makes no exception for cases arising in the area of police and fire protection and no satisfactory explanation as to why section 8 of the Court of Claims Act is not applicable here is offered anywhere in the majority opinion. There are lower court cases holding the municipality might be held liable for the failure of the police to protect a person, where they had actual notice of a probable assault. (Isereau v. Stone, 207 Misc. 941, revd. on other grounds 3 A D 2d 243; Canosa v. City of Mt. Vernon, N. Y. L. J., Feb. 18,1965, p. 17, col. 6.)
Some indication of the movement of the law against the existing rule can be extracted from the fact that, whereas a few decades ago, the rule that there is no duty to provide adequate police and fire protection was attacked only intermittently, in recent years more and more insistently we have been asked to reject the rule. An assault can be found now in almost every recent volume of the New York Reports, but never before has the question ‘ ‘ been presented in so stark a manner as in the case before us ” (Fuld, Ch. J., in Babcock v. Jackson, 12 N Y 2d 473, 484).
The rule is Judge made and can be judicially modified. By statute, the judicially created doctrine of “ sovereign immunity ” was destroyed. It was an unrighteous doctrine, carrying as it did the connotation that the government is above the law. Likewise, the law should be purged of all new evasions, which seek to avoid the full implications of the repeal of sovereign immunity.
No doubt in the future we shall have to draw limitations just as we have done in the area of private litigation, and no doubt some of these limitations will be unique to municipal liability *593 because the problems will not have any counterpart in private tort law. But if the lines are to be drawn, let them be delineated on candid considerations of policy and fairness and not on the fictions or relics of the doctrine of “ sovereign immunity”. Before reaching such questions, however, we must resolve the fundamental issue raised here and recognize that, having undertaken to provide professional police and fire protection, municipalities cannot escape liability for damages caused by their failure to do even a minimally adequate job of it.
The Appellate Division did not adopt the ‘1 no duty ’ ’ theory, but said there was no negligence here because the danger was not imminent. Despite the fact that the majority of the Appellate Division “ agree [d] that certain rulings, and particularly the manner in which they were made, did not add to the appearance of a fair trial ’ and which, in fact, resulted in a wholly inadequate hearing, the majority found that the “ facts brought out on this trial do not show the presence of such imminent danger that extraordinary police activity was so indicated that the failure to take it can be deemed unreasonable conduct. ’ ’ This finding does not stand examination and to its credit the city does not argue that this record would not support a finding of negligence. The danger to Linda was indeed imminent, and this fact could easily have been confirmed had there been competent police work.
Moreover, since this is an appeal from a dismissal of the complaint, we must give the plaintiff the benefit of every favorable inference. The Appellate Division’s conclusion could only have been reached by ignoring the thrust of the plaintiff’s claim and the evidence in the record. A few examples of the actions of the police should suffice to show the true state of the record. Linda Biss received a telephone call from a person who warned Linda that Pugach was arranging to have her beaten up. A detective learned the identity of the caller. He offered to arrest the caller, but plaintiff rejected that suggestion for the obvious reason that the informant was trying to help Linda. When Linda requested that Pugach be arrested, the detective said he could not do that because she had not yet been hurt. The statement was not so. It was and is a crime to conspire to injure someone. True there was no basis to arrest Pugach then, but that was only because the necessary leg work had not been done. No one *594 went to speak to the informant, who might have furnished additional leads. Linda claimed to be receiving telephone calls almost every day. These calls could have been monitored for a few days to obtain evidence against Pugach. Any number of reasonable alternatives presented themselves. A case against Pugach could have been developed which would have at least put him away for awhile or altered the situation entirely. But, if necessary, some police protection should have been afforded.
Perhaps, on a fuller record after a true trial on the merits, the city’s position will not appear so damaging as it does now. But with actual notice of danger and ample opportunity to confirm and take reasonable remedial steps, a jury could find that the persons involved acted unreasonably and negligently. Linda Biss is entitled to have a jury determine the issue of the city’s liability. This right, should not be terminated by the adoption of a question-begging conclusion that there is no duty owed to her. The order of the Appellate Division should be reversed and a new trial granted.
Chief Judge Fuld and Judges Burke, Scileppi, Bergan and Jasen concur with Judge Breitel ; Judge Keating dissents and votes to reverse in a separate opinion.
Order affirmed, without costs.

 Originally, the doctrine of “sovereign immunity” was categorically rejected in New York. Lloyd, Municipal Tort Liability in New York, 23 N. Y. U. L. Rev. 278, 279-281.